BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

IN RE: IN RE: FANDUEL, INC.,
FANTASY SPORTS LITIGATION.    MDL Docket No. 2679

PLAINTIFFS[1] ANTONIO GOMEZ AND RICARDO ALEJANDRO GARCIA'S
RESPONSE TO MOTION FOR TRANSFER OF ACTIONS

Antonio Gomez and Ricardo Alejandro Garcia ("Plaintiffs" or "Gomez/Garcia"), in the action styled *Antonio Gomez, et al. v. FanDuel, Inc., et al., No. 15-23858-cv-PCH,* pending in the United States District Court for the Southern District of Florida, through undersigned counsel, respectfully request that the Judicial Panel on Multidistrict Litigation ("Panel") enter an Order pursuant to 28 U.S.C. § 1407 transferring and consolidating the cases identified in the Schedule of Actions ("Related Cases") (attached as Ex. A) to the United States District Court for the Southern District of Florida or alternatively the Southern District of New York to District Judge Schira A. Scheindlin. Each of the Related Cases arise from fantasy sports gambling and the activities of Defendants FanDuel, Inc. and DraftKings, Inc. and many are premised on the same or similar allegations and legal theories.

All of the factors considered by the Panel support the transfer and consolidation of these actions to a single court. Centralization of this litigation will serve the interests of justice, judicial economy, and notions of legal comity by avoiding inconsistent pretrial rulings and duplicative discovery. The risk of inconsistent pre-trial rulings is particularly high here, where plaintiffs have filed numerous overlapping class actions and have common legal issues, such as the applicability of FanDuel and DraftKings' User Agreements' arbitration clauses, class action

---

[1] Plaintiffs advise the Court that they are filing the identical motion in two other highly related proceedings: MDL 2677, *In re Daily Fantasy Sports Marketing and Sales Practices Litigation* and MDL 2678, *In re: DraftKings, Inc., Fantasy Sports Litigation.*

1

waiver and jury trial waivers which plaintiffs assert are void or voidable and all parties are best served by a uniform ruling on these issues.

All of the Related Cases are premised on the same events and conditions and seek legal relief grounded in similar legal theories. Thus, the Related Cases will involve essentially the same discovery regarding FanDuel and DraftKings' activities, including: 1) FanDuel and DraftKings allowing their employees to play on their websites and on each other's websites against plaintiffs; 2) FanDuel and DraftKings' knowledge of Apex Predator bettors and Shark bettors use of bots, scripts and robots to gain an unfair advantage over plaintiffs; and 3) if FanDuel and DraftKings gave the Apex Predator bettors and Shark bettors consent to use methods that give the Apex Predator bettors and Shark bettors an unfair advantage over plaintiffs. Accordingly, discovery requests in these actions will be overlapping and duplicative, and will result in unnecessary burden on the parties and the many courts where these cases are currently pending. As the Related Cases are still in their initial stages, these inefficiencies can be avoided by immediate transfer and coordination or consolidation.

The Southern District of Florida, Miami Division, is the most appropriate forum for transfer and centralization because: 1) FanDuel and DraftKings' conduct has caused and will cause significant economic impact in the state of Florida; 2) FanDuel and DraftKings' conduct is illegal gambling under the laws of the state of Florida; and 3) thousands of Florida consumers are entitled to a refund of their entry fees for the contests on FanDuel and DraftKings' websites because FanDuel and DraftKings' betting websites were illegal in the state of Florida. Thus, Florida has a strong nexus to the litigation due to its large population of FanDuel and DraftKings' users. The state of Florida, based on its population alone is believed to have a high

percentage of putative plaintiffs. Moreover, Miami is the most convenient city for all of the plaintiffs.

In addition, the Southern District of Florida, Miami Division, has handled some of the largest MDL cases in the United States including the *In re: Managed Care HMO Litigation* and *In re: Checking Account Overdraft Litigation,* MDL No. 2036. District Judge Paul C. Huck, the assigned judge in the Gomez/Garcia action is a distinguished jurist who presided over MDL 2073, the *In Re: Optimal Strategic U.S. Equity Fund Securities Litigation,* 648 F.Supp.2d 1388 (J.P.M.L. 2009) (favoring the Southern District of Florida and Judge Huck over the Southern District of New York). Judge Huck has experience with MDL litigation, is on senior status, and has the time and skills necessary to effectively manage this complex and complicated litigation. Accordingly, transfer and consolidation of this litigation in the Southern District of Florida, Miami Division, would greatly promote the just and expeditious resolution of these actions.

## I. BACKGROUND ON THE LITIGATION

Defendants FanDuel and DraftKings are fantasy sports gaming websites. The competitions vary by sport and format, but the most popular forum is daily or weekly fantasy football. In a typical competition, customers "buy-in"—anywhere from $1 to thousands of dollars—against other participants with hopes that they will field the best fantasy football "team." The basic format for fantasy sports is best typified by a typical bet on a NFL game. Plaintiffs/users are provided a budget by FanDuel and DraftKings to spend on players that are competing in games that week in the NFL. The budget is an artificial number, $60,000 for example. NFL players are assigned a salary by Defendants DraftKings or FanDuel. Users, bound by a fictitious salary cap, select a roster of players they believe will perform well in terms

3

of individual statistics. The user selects their team by player positions based on the salaries assigned by DraftKings or FanDuel, not to exceed the salary cap and budget.

At a time certain before the NFL games begin, no further entries are allowed and a user sets their roster. The NFL players each earn points for the user based upon their performance in the games. The user with the highest total of points in relation to other users in that game wins.

Defendants FanDuel and DraftKings generate their revenue by hosting competitions among individual users and, for their services, take a "rake" of the earnings. Though the rake varies by game type and amount, it normally hovers around 10 percent. In a typical competition wherein 10 players bet $10 each in a winner-takes-all format, the champion will walk away with $90 of the $100, with Defendants, FanDuel and DraftKings, taking their 10 percent rake of $10. The amount of the prize in a fantasy sports game is set in advance of the game even though the number of users who will enter the game is unknown.

To lure customers, Defendants, FanDuel and DraftKings saturate television, particularly commercials airing during sporting events, with seductive advertising. In 2014, DraftKings alone had 1,782 separate television ads. One advertisement for Defendant DraftKings profiles user Derek Bradley, a former accountant. "DraftKings one-day fantasy baseball took him from a guy with holes in his underpants," the announcer states, "to a guy with bikini models in them!" DraftKings alone spent approximately $23.6 million on television advertisements in September 2015. Internet advertisements, on FanDuel and DraftKings' websites and elsewhere, likewise funnel significant business to their online betting interface. In the first week of the 2015 NFL season alone, FanDuel and DraftKings were expected to receive a combined $60 million in entry fees.

## II. ARGUMENT

### a. Transfer is appropriate pursuant to 28 U.S.C. § 1407

Transfer of the FanDuel and DraftKings litigation is appropriate pursuant to 28 U.S.C. § 1407. The purpose of multi-district litigation is to ensure the just, efficient, and consistent conduct and adjudication of actions pending in multiple districts by providing for the centralized management of pre-trial proceedings under a single court's supervision. *See 28 U.S.C. § 1407(a).* Accordingly, courts have held that multi-district litigation is appropriate where it "promote[s] the just and efficient conduct' of 'civil actions involving one or more common questions of fact' that are pending in different districts." *In re Phenylpropanolamine (PPA) Products Liab. Litig,* 460 F.3d 1217, 1229 (9th Cir. 2006) (quoting 28 U.S.C. § 1407(a)). Upon a motion to transfer, the Panel "analyzes each group of cases in light of the statutory criteria and the primary purposes of the MDL process to determine whether transfer is appropriate." *Id.* at 1230. To determine whether to consolidate or coordinate proceedings, the Panel assesses whether centralization will: (1) avoid the possibility of conflicting pre-trial rulings; (2) eliminate or reduce duplicative discovery; and (3) conserve the efforts and resources of the parties, their counsel, witnesses, and the judiciary. *In re Imagitas, Inc., Drivers' Privacy Prot. Act. Litig,* 486 F. Supp. 2d 1371, 1372 (J.P.M.L. 2007). Here, each of these considerations decisively favors MDL consolidation.

#### i. Transfer to the MDL will avoid the possibility of conflicting rulings.

Transfer and consolidation of the various actions will avoid the possibility of conflicting pre-trial rulings. Plaintiffs assert many of the same claims - negligence, violation of unfair and deceptive trade practices acts, breach of contract, unjust enrichment, declaratory and injunctive relief and civil RICO, among others, which could result in inconsistent rulings if addressed by separate courts. *See In re Terrorist Attacks on Sept. 11 2001,* 295 F. Supp. 2d 1377, 1378

(J.P.M.L. 2003) (noting that transfer is favored where there is overlapping legal issues among the various cases). In particular, a decision regarding whether the FanDuel and DraftKings' User Agreements are void or voidable will have particular importance early on in these cases. Issues in pre-trial motions regarding the User Agreements should be determined in a single proceeding in front of a single judge.

Furthermore, the Related Cases include more than a dozen class actions that seek certification of overlapping classes. There is a significant risk of inconsistent pre-trial rulings where class actions proceed simultaneously in different forums and jurisdictions. *See In re Plumbing Fixture Cases,* 298 F. Supp. 484, 493 (J.P.M.L. 1968) ("[it] is in the field of class action determinations in related multidistrict civil actions that the potential for conflicting, disorderly, chaotic judicial action is the greatest"). As this Panel has consistently recognized, centralization is appropriate where there are numerous class actions pending in different forums in order to prevent "inconsistent pretrial rulings." *In re Imagitas, Inc., Drivers' Privacy Prot. Act Litig,* 486 F. Supp. 2d at 1372. Thus, with more than a dozen class actions pending in at least six different jurisdictions the risk for inconsistent pre-trial rulings is significant and substantial. Accordingly, this factor weighs in favor of the transfer and centralization of this litigation.

### ii. Transfer will eliminate the likelihood of duplicative discovery.

The Related Cases are all primarily premised on the same nucleus of operative facts – 1) FanDuel and DraftKings' conducting illegal internet gambling in violation of state and federal law; 2) FanDuel and DraftKings' employees using insider information to win games on their employer's websites; 3) FanDuel and DraftKings' allowing Apex Predator bettors and Shark bettors an unfair advantage over plaintiffs by the use of advanced computer programs and algorithms known as bots, spiders and scripts; and 4) FanDuel and DraftKings unfair and

deceptive advertisement and business practices. Therefore, the Related Cases involve essentially the same actors, facts, and legal theories and will involve largely duplicative discovery. Specifically, discovery will seek documents and witnesses regarding, among other things: 1) whether fantasy sports betting violates state and federal law; 2) the use of insider information by FanDuel and DraftKings' employees to bet on their employer's websites and other gaming websites; 3) FanDuel and DraftKings knowledge of Apex predator and Shark bettors using advanced computer programs and algorithms known as bots, spiders and scripts when those methods are expressly prohibited by Defendants' User Agreements; and, 4) FanDuel and DraftKings giving consent to Apex predator and Shark bettors using advanced computer programs and algorithms known as bots, spiders and scripts without disclosure to the general public when those methods are expressly prohibited by Defendants' User Agreements. Without consolidation, the plaintiffs would be required to issue, and the defendants would be required to respond to, numerous discovery requests seeking the same information, and witnesses would be required to submit for multiple and duplicative depositions. Furthermore, without consolidation, discovery disputes would be largely duplicative but consolidation would promote efficiency and allow these disputes to be argued and resolved just once. *See, e.g., In re Ocean Fin. Corp. Prescreening Litig,* 435 F. Supp. 2d 1350, 1351-52 (J.P.M.L. 2006) (holding that centralization would eliminate duplicative discovery where plaintiffs brought claims on behalf of overlapping classes). Accordingly, this factor favors consolidation because it would effectively eliminate the duplicative discovery involved in the Related Cases.

### iii. Transfer will conserve the efforts and resources of the parties, their counsel witnesses' and the judiciary.

By eliminating or reducing duplicative discovery and avoiding the possibility of conflicting pre-trial rulings, consolidation by the MDL will significantly reduce the efforts and

expenditures of the parties' resources. Transfer preserves the parties' and the judiciary's resources because the same documents, witnesses, and physical evidence will be involved, document discovery and other written discovery would be provided once through coordinated discovery, and depositions would proceed once as to all parties instead of the numerous times that would otherwise be required if transfer were denied. In addition, the judiciary's resources are further preserved by transfer because it would allow one, as opposed to the numerous federal judges that would otherwise be required to preside over the same claims involving the same parties.

Moreover, none of the parties are unfairly prejudiced by transfer, because discovery has not yet commenced in any of the Related Cases. Because there has been no production of discovery and no discovery or pre-trial schedules established, there are no practical impediments to expedient coordination and the implementation of uniform pre-trial procedures and scheduling.

    **b. The related cases should be transferred to the Southern District of Florida or in the alternative, the Southern District of New York.**

The Panel should transfer the Related Cases to the Southern District of Florida. Although all parties agree that consolidation is appropriate under the facts and circumstances of this case, they disagree as to the appropriate forum in which to consolidate the actions. Section 1407 does not specify the factors that the Panel must consider in determining the particular district in which to consolidate the litigation. However, the Panel, in selecting an MDL location, has looked at the district courts' docket conditions, the centrality of the district in relation to the harm, and the district's accessibility. Here, all of these factors support transfer to the Southern District of Florida or the Southern District of New York.

### c. The docket conditions of the Southern District of Florida are more favorable than other fora.

The Southern District of Florida is among the least burdened of the districts being considered for transfer and has significantly more favorable docket conditions than the Eastern District of Louisiana, the Southern District of New York. The Panel considers the respective docket conditions of the districts where transfer is proposed. *In re Teflon Prods. Liab. Litig,* 416 F. Supp. 2d 1364, 1365 (J.P.M.L. 2006). The Southern District of Florida has 4,870 pending cases. (Judicial Business of the United States Courts, 2014 Annual Report of the Director at Table C) ("Annual Report"). This is substantially less than the 13,838 cases pending in the Southern District of New York or the 6,055 pending in the Eastern District of Louisiana. *Id.* A comparison of judicial caseloads demonstrates that the Southern District of Florida is the least burdened of the districts. *Id.* The Southern District of Florida averages only 380 cases per judge. *(Federal Court Management Statistics, 2014 – National Judicial Caseload Profile).* In comparison, the Southern District of New York averages 668 cases per judge and the Eastern District of Louisiana 532 cases. *Id.* Thus, the Southern District of Florida has the least burdened docket of the various proposed MDL locations.

The Panel also examines, "[t]he percentage of cases over three years old" on a district's docket. D. Herr, *Multidistrict Litigation Manual: Practice Before the Judicial Panel on Multidistrict Litigation,* § 6:17 at 210-11 (2008). Here again, the Southern District of Florida is by far the most efficient district with only 2.3% of its cases pending three years or more. (*Annual Report* at Table C-6.). The Southern District of New York's rate is 23.1% and the Eastern District of Louisiana's 19.9%. *Id.*

Another indication of the Southern District of Florida's efficiency is that its average median time for disposition of a case is significantly shorter than the Southern District of New

York or Eastern District of Louisiana. (Annual Report, at Table C-5.) The Panel has recognized that a short median time for disposition of a case is a significant factor in selecting the proper transferee court. *In re Nat'l Student Marketing Litig,* 368 F. Supp. 1311, 1318 (J.P.M.L. 1972) (noting the importance of median time to disposition when comparing districts). Here, the Southern District of Florida's median time for disposition of a case is less than five months. (Annual Report, at Table C-5.) In contrast, the median time for disposition of a case in the Southern District of New York is over nine months and for the Eastern District of Louisiana it is nearly six months. *Id.* Furthermore, the judges in the Southern District of Florida are exceptionally qualified and experienced, as evidenced by the Panel's selection of the Southern District of Florida as the transferee court in numerous MDL actions. The Panel has consistently acknowledged that MDL experience is an important factor in deciding upon a transferee court. *See In re Trasylol Products Liability Litigation,* 545 F.Supp.2d 1357, 1358 (J.P.M.L. 2008) (assigning case to the Southern District of Florida and stating, "by centralizing this litigation before Judge Donald M. Middlebrooks, we are assigning this litigation to a jurist who has the experience to steer this litigation on a prudent course.").

## d. The Southern District of Florida has a strong nexus to the litigation.

The Southern District of Florida has a strong nexus to the litigation. The Panel has articulated a concern for "centrality" in selecting a district that best represents the parties involved in the litigation. *See, e.g., In re TJX Companies, Inc.,* 505 F. Supp. 2d 1379, 1380 (J.P.M.L. 2005). In determining centrality, the Panel examines the geography and economic impact caused by the alleged wrongful conduct. Here, both those factors weigh in favor of the Southern District of Florida.

The Southern District of Florida a convenient and central forum for the MDL. The Panel examines the accessibility of districts to determine whether one district is more readily accessible than the others. *See In re LLRICE 601 Contamination Litig.,* 466 F. Supp. 2d 1351 (J.P.M.L. 2006) (looking to the accessibility of the forum). Here, the Southern District of Florida is a more convenient and favorable location than the Southern District of New York and the Eastern District of Louisiana.

The Southern District of Florida is a convenient forum for the vast majority of the parties. While it is true that no single location will be convenient to all parties, the Southern District of Florida is the most convenient for the vast majority of them. Florida, due to the size of its population will have vast amounts of plaintiffs that have been economically harmed by Defendants' conduct. It is likely that a substantial number of plaintiffs will reside in Florida, and Miami will be a more convenient forum for them to litigate their claims in than in New York or New Orleans.

e. **Miami is an accessible location.**

The Panel has recognized Miami's convenience. *See In re Trasylol Products Liability Litigation,* 545 F.Supp.2d 1357, 1358 (J.P.M.L. 2008) ("after careful consideration, we are persuaded that the Southern District of Florida is an appropriate transferee forum .... [it] offers an accessible metropolitan location"). The Miami International Airport is the twelfth busiest airport in the United States and is the largest airport in Florida.[2] The airport services approximately 40.9 million passengers per year through 101 different carriers. *Id.* Through its 399,048 commercial aircraft movements, it offers daily non-stop service to all major U.S. cities, including but not limited to, Boston, New York, New Orleans, Houston, Dallas, Chicago, Birmingham, Memphis,

---

[2] http://www.miami-airport.com/pdfdoc/facts_at_a_glance.pdf

Washington, D.C, Charlotte, Atlanta, Orlando and Tampa. Furthermore, the airport is less than ten miles from downtown Miami and the federal courthouses.

The Miami International Airport has completed construction of its "MIA Mover," a dual track 1.25-mile long elevated people mover system that connects passengers to its new Rental Car Center and the Miami Intermodal Center, touted as "Miami-Dade County's own grand central station." The MIA Mover's capacity is more than 3,000 passengers per hour between Miami International Airport and the Miami Intermodal Center. It also allows passengers to travel directly from the airport to Miami-Dade County's downtown and business districts where the federal courthouses are located, within minutes for a minimal fare.

In 2014, the Miami International Airport ranked first in the United States by percentage of international flights and second by volume of international passengers, as a direct result of its close proximity to Latin America and the Caribbean, as well as its strategic location to handle connecting flights between North America, Latin America, and Europe. See *id.* Indeed, Miami is the most accessible district for Central American and Caribbean plaintiffs. Miami International Airport is the gateway to Latin America and the Bahamas, as nearly half of the daily flights at Miami International Airport arrive or depart from various cities in Latin America, the Caribbean, and the Bahamas.[3]

In addition to the Miami International Airport, there are two other major airports that service the tri-county area. The Fort Lauderdale International Airport is approximately twenty miles north of the downtown Miami business district and the federal courthouses and is in close proximity to several major highways, including 1-95 and U.S. 1, which connect it to Miami. The Fort Lauderdale International Airport is the 21st busiest airport in the United States in terms of

---

[3] https://en.wikipedia.org/wiki/Miami_International_Airport

overall passengers and is serviced by numerous low-cost air carriers.[4] The Palm Beach International Airport is located adjacent to 1-95 in West Palm Beach. It serves over six million passengers annually through sixteen commercial and commuter airlines and was recently voted the third best airport in the United States by the *Conde Nast Traveler*.[5] Thus, these three airports offer unparalleled access to the Miami courthouses and offer all parties an ease and convenience unrivaled by any of the other locations being considered by the Panel.

Transportation in Miami is also significantly easier than the other locations being considered. There are over numerous taxi companies operating in Miami. Uber also operates in Miami. In addition, Miami's public rail system provides easy access from the North and South of Miami to the downtown Miami area and the federal courthouses at a minimal expense. The Miami public rail system has 23 stations providing access for bus riders, pedestrians, and passengers[6] and connects to the Miami International Airport, all Miami-Dade County bus lines, Tri-Rail, and Amtrak. The Tri-Rail, a commuter rail system, provides convenient service from Fort Lauderdale and Palm Beach to downtown Miami and the courthouses. The downtown Miami area is also serviced by the Miami Metromover, which runs on a loop exclusively in the downtown Miami area with stops just blocks from the federal courthouses. The Miami Metromover arrives every 90 seconds during rush hour and is free for its passengers.[7]

With its more than 460 world-class hotels and over 50,000 hotel rooms,[8] Miami clearly has sufficient infrastructure to handle the litigants and their attorneys. The downtown Miami area alone has over 25 major hotels, all of which are within close proximity to the various public

---

[4] http://www.broward.org/Airport/About/Pages/Default.aspx
[5] http://www.pbia.org/about/
[6] http://www.miamidade.gov/transit/metrorail.asp
[7] http://www.miamidade.gov/transit/riding-metromover.asp
[8] http://www.miamiforvisitors.com/local/facts.htm

13

transportation systems discussed above and the federal courthouses. Thus, Miami is clearly able to accommodate the large influx of attorneys related to the MDL and, more importantly, Miami offers a variety of modestly priced hotels as well as higher end upscale hotels to meet all of the litigants' and their attorneys' budgets. Rental homes and condominiums are also abundant, allowing for the litigants and their attorneys to open a satellite office to support their litigation efforts.

Thus, all of the factors decisively support the selection of the Southern District of Florida over the Eastern District of Louisiana as the site of the litigation. In the alternative, Gomez/Garcia advocate for the Southern District of New York, with District Judge Schira A. Scheindlin as the judge and site of the litigation.

## III. CONCLUSION

Gomez/Garcia respectfully request that the Panel consolidate all of the Related Cases for discovery and pre-trial purposes under 28 U.S.C. § 1407 and transfer them to the Southern District of Florida, Miami Division, or in the alternative, the Southern District of New York with District Judge Schira A. Scheindlin as the judge.

**Dated**: November 4, 2015.

Respectfully submitted,

By: /s Ervin A. Gonzalez
Ervin A. Gonzalez
Ervin@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134
Telephone: 305.476.7400
Facsimile: 305.476.7444
*Attorney for Plaintiffs Gomez/Garcia*

-AND-

CHRISTOS LAGOS, Esq.
Florida Bar No. 149690
Lagos@attainjustice.com
JOHN PRIOVOLOS, Esq.
Florida Bar No. 690112
john@priolaw.com
LAGOS & PRIOVOLOS PLLC
66 West Flagler Street
Suite 1000
Miami, FL 33130
Tel: (305) 960-1990
Fax: (305) 891-2610
*Counsel for Plaintiffs*